**EAST JEFFERSON COALITION FOR LEADERSHIP AND DEVELOPMENT, et al., Plaintiffs–Appellees, Cross–Appellants,**

v.

**PARISH OF JEFFERSON, et al., Defendants–Appellants, Cross–Appellees.**

**Nos. 89–3486, 90–3456.**

United States Court of Appeals, Fifth Circuit.

March 21, 1991.

Harry A. Rosenberg and M. Nan Alessandra, Phelps, Dunbar, New Orleans, La., for defendants-appellants, cross appellees.

Ronald L. Wilson, New Orleans, La., Terry E. Allbritton and M. David Gelfand, Tulane Law School, Appellate Advocacy Clinic, New Orleans, La., for East Jefferson Coalition.

Before CLARK, Chief Judge, GARZA and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

The Parish of Jefferson appeals the district court's adverse judgment under § 2 of the Voting Rights Act of 1965 ordering implementation of a redistricting plan for the Parish Council. We affirm.

## I.

The Parish of Jefferson is a political subdivision of the State of Louisiana. In 1957 voters in Jefferson Parish approved a Home Rule Charter authorizing a seven-member council to manage and operate the Parish government. The Charter apportioned Jefferson Parish into four districts. Each district elected one council member. Two flotorial districts—one comprised of districts 1 and 2 and the other comprised of districts 3 and 4—also elected one council member each. The Chairman of the council was elected at-large from the entire Parish.

According to the 1980 United States Census, blacks in Jefferson Parish comprised 13.86 percent of the total population and 11.78 percent of the voting age population. During the last four elections in Jefferson Parish, four black candidates have sought seats on the parish council. No black candidate has been elected.

Six black residents of Jefferson Parish, the East Jefferson Coalition for Leadership and Development, and the Lincoln Manor Civic Association (collectively "the Coalition") sued the Parish of Jefferson and various parish and state officials (collectively "the Parish"). These plaintiffs asserted that the electoral system in Jefferson Parish dilutes black voting strength in violation of § 2 of the Voting Rights Act of 1965. After a bench trial, the district court ruled that the Parish's electoral scheme violated § 2 of the Voting Rights Act, despite finding that blacks in Jefferson Parish are widely dispersed. Shortly after the district court issued its opinion, the Coalition moved to amend the court's factual finding that the black population in Jefferson Parish is widely dispersed. The district court denied the motion.

Although the district court found a violation of the Voting Rights Act, it rejected the Coalition's proposed plan—a 35–sided district spanning both sides of the Mississippi River—as a "totally unacceptable gerrymander and an impermissible short cut to force proportional representation on the Council." *East Jefferson Coalition for Leadership & Dev. v. Parish of Jefferson,* 691 F.Supp. 991, 1008 (E.D.La.1988). The court ordered the parties to submit alternative plans. *Id.* About five months later, both the Coalition and the Parish submitted redistricting proposals to the court. Before the district court acted on the redistricting proposals, the Parish appealed from the district court's ruling that the Parish's electoral scheme violated the Voting Rights Act. This Court dismissed the appeal, holding that the district court had not yet issued an appealable order.

The district court later proposed adoption of the Parish's redistricting proposal with some modifications and ordered a public hearing for interested parties to show why the modified plan should not be finally adopted. *East Jefferson Coalition for Leadership & Dev. v. Parish of Jefferson,* 703 F.Supp. 28 (E.D.La.1989). After the hearing, the court ordered implementation of the modified plan. *East Jefferson Coalition for Leadership & Dev. v. Parish of Jefferson,* 706 F.Supp. 470 (E.D.La.1989). The modified plan maintained the seven-member council, but created six single-member districts (in place of four single-member districts and two flotorial districts) and one at-large district.

After ordering final adoption of the modified redistricting plan, the district court denied the Coalition's motion to require the Parish to present proof that the redistricting plan resulting from the litigation had been submitted to the United States Department of Justice for preclearance under 42 U.S.C. § 1973c.[1] Instead the district court forwarded a copy of its prior opinions and the redistricting plan to the Justice Department for preclearance. The Justice

Department rejected the court's request for preclearance, stating that preclearance must be sought by the Parish. The court then ordered the Parish to seek preclearance. The Parish complied two months later.

In the meantime, the Parish filed its second notice of appeal. This Court again dismissed the appeal, however, because the district court's decision had not been set forth on a separate document as required by Fed.R.Civ.P. 58. Shortly thereafter, the district court issued a separate judgment. The Parish then appealed for a third time, and the Coalition cross-appealed.

While the appeals were pending, the Justice Department issued a letter, on behalf of the Attorney General, objecting to the plan adopted by the district court. Although the plan included one district with 46 percent black population ("a marked increase from the most heavily black district in the current plan"), the Justice Department suggested that the plan "may well have been motivated by an invidious purpose to minimize black voting strength in the proposed districting plan." After receiving the letter, this Court granted the Coalition's motion to remand the case for imposition of a remedy.

Shortly after the matter was returned to the district court, the Coalition requested that the district court adopt a plan with seven single-member districts. The Parish opposed that idea and offered an alternative plan to comply with the Justice Department's letter. The district court held a hearing to consider the Parish's alternative redistricting plan. Like the plan previously adopted by the district court, the alternative plan contemplated six single-member districts and one at-large district. The alternative plan departed from the previous plan, however, by including a black majority district. After the hearing, the Coalition withdrew its motion to adopt a plan involving seven single-member districts, and the

1. Section 5 of the Voting Rights Act requires that any change in a "standard, practice or procedure with respect to voting" by a "covered jurisdiction" (including Jefferson Parish) be submitted to the United States Attorney General for prior approval or "preclearance." 42 U.S.C. § 1973c (1982); 28 C.F.R. § 51.1 *et seq.* (1989).

Justice Department precleared the Parish's alternative plan.

The Justice Department then filed a "Memorandum of the United States as Amicus Curiae" with the district court, urging the court to amend its prior finding that blacks are widely dispersed throughout Jefferson Parish. The district court, invoking Fed.R.Civ.P. 52(b),[2] amended its prior findings and ruled that "the minority group is sufficiently large and geographically compact to constitute a majority within a single-member district." The district court later granted a joint motion by the Parish and the Coalition to approve the Parish's alternative plan. The Parish filed a new notice of appeal, and this Court consolidated the new appeal with the old appeal.

## II.

■■■ The Supreme Court has established three "necessary preconditions" to a claim under § 2 of the Voting Rights Act: (1) that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) that the minority group is politically cohesive; and (3) that a bloc-voting white majority usually defeats the minority's preferred candidate. *Thornburg v. Gingles,* 478 U.S. 30, 50–51, 106 S.Ct. 2752, 2766, 92 L.Ed.2d 25 (1986). Each of these preconditions is a question of fact subject to the clearly erroneous standard of Rule 52(a). *Overton v. City of Austin,* 871 F.2d 529, 533 (5th Cir.1989); *Brewer v. Ham,* 876 F.2d 448, 450 (5th Cir.1989).

■■■ If the plaintiffs prove all three preconditions, the court must evaluate the "totality of the circumstances" to determine whether the challenged electoral system impedes the ability of minority voters to elect representatives of their choice. *See* 42 U.S.C. § 1973(b); *Gingles,* 478 U.S. at 79, 106 S.Ct. at 2781. In evaluating the totality of the circumstances, the court should consider the factors listed in the Senate Judiciary Committee majority re-

port accompanying the 1982 bill that amended § 2 of the Voting Rights Act. *Westwego Citizens for Better Government v. City of Westwego,* 872 F.2d 1201, 1206 (5th Cir.1989) (citing *Campos v. City of Baytown,* 840 F.2d 1240, 1249 (5th Cir. 1988)); *Citizens For a Better Gretna v. City of Gretna,* 834 F.2d 496, 498–99 (5th Cir.1987). An ultimate finding of vote dilution is a question of fact subject to the clearly erroneous standard of Rule 52(a). *Gingles,* 478 U.S. at 78, 106 S.Ct. at 2780; *Rogers v. Lodge,* 458 U.S. 613, 622–23, 102 S.Ct. 3272, 3278, 73 L.Ed.2d 1012 (1982).

## III.

The Parish challenges the district court's findings with respect to each of the three preconditions as well as the district court's finding that under the "totality of the circumstances," the challenged electoral system impedes the ability of minority voters to elect representatives of their choice. We address each of these objections in turn.

The first precondition is that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district. In its initial memorandum decision, the district court recognized "majority black precincts" in various parts of Jefferson Parish, but found that the "black population is dispersed widely throughout the Parish." 691 F.Supp. at 1006–07. Shortly after the district court issued its decision, the Coalition moved to amend this factual finding. The district court denied the motion, thus reaffirming its finding that blacks are widely dispersed throughout Jefferson Parish. The district court again reaffirmed its finding when it proposed adoption of the Parish's modified redistricting plan: "While there are some areas with a heavier concentration of blacks than others, blacks are dispersed throughout the parish." 703 F.Supp. at 30. On remand from this Court, the district court invoked Rule 52(b) at the urging of

---

**2.** Rule 52(b) provides in relevant part:
  Upon motion of a party made not later than 10 days after entry of judgment the court may

amend its findings or make additional findings and may amend the judgment accordingly.

the Justice Department and amended its prior findings, ruling that "the minority group is sufficiently large and geographically compact to constitute a majority within a single-member district."

■ Rule 52(b) allows the district court to amend its findings only "[u]pon motion of a party made not later than 10 days after entry of judgment." Assuming without deciding that the Department of Justice is a party to this action, the amended findings could not be made under Rule 52(b) because almost eleven months had passed since the original judgment. Even though we cannot uphold the district court's decision to amend its factual findings under Rule 52(b), we can uphold the amended findings if the court's action was authorized on some other ground. *See, e.g., Howell Hydrocarbons, Inc. v. Adams,* 897 F.2d 183, 193 (5th Cir.1990) (affirming summary judgment and dismissal on an alternate ground). After reviewing the record, we conclude that the district court did not need to invoke Rule 52(b) (which applies to amendments made after entry of judgment) because the court acted within the scope of our remand order.

■ In our remand order, we stated that we were remanding the case "for imposition of a remedy." Both parties then submitted redistricting proposals with a majority black district. Before that time, the Parish had not proposed any plan containing a majority black district, and the district court consistently had deferred to the political judgment of the Parish. In the face of tangible evidence submitted by the Parish that a majority black district could be formed in Jefferson Parish, the district court amended its prior finding on geographic compactness. Strictly speaking, this finding is part of the "liability" phase in a Voting Rights Act case. But the "liability" phase and the "remedy" phase of Voting Rights Act cases frequently merge. In this case, for example, the Parish did not present definitive evidence on geographic compactness until the remedy phase. Because the finding and the evidence on which it was predicated are closely related to the remedy phase of the case, we conclude that the district court did not exceed our remand order.

The Parish argues that it was denied procedural due process when the district court amended its factual findings without a hearing. The Parish was not given an opportunity to respond to the Justice Department's "amicus memorandum," but that memorandum did not raise any new issues. It merely resuscitated an issue that had been fully and fairly litigated at the trial.

## IV.

The second precondition to liability under *Gingles* is that the minority group be politically cohesive. After considering evidence on numerous elections in Jefferson Parish, the district court found that blacks in the Parish are politically cohesive. 691 F.Supp. at 1004. The Parish contends that the district court erred by: (1) determining that the inquiry into political cohesion is subsumed by the inquiry into polarized voting; (2) considering exogenous elections, that is, elections for offices other than Parish Council; (3) limiting its analysis of racial polarization to elections involving black candidates; and (4) finding racial polarization in councilmanic elections.

### Political Cohesion and Racially Polarized Voting

■ The Supreme Court has said that racially polarized voting is "a key element of a vote dilution claim," and that courts should look at racially polarized voting "to ascertain whether minority group members constitute a politically cohesive unit." *Gingles,* 478 U.S. at 55, 56, 106 S.Ct. at 2769. This Court has stated that the inquiry into political cohesion "is not an inquiry to be made prior to and apart from a study of polarized voting ... because the central focus is upon voting patterns." *Campos,* 840 F.2d at 1244. The district court, therefore, did not err by determining that the inquiry into political cohesion is subsumed by the inquiry into polarized voting.

### Exogenous Elections

■ Both the Parish and the Coalition analyzed councilmanic primary and general elections from 1975–1983. The Coalition also analyzed thirteen noncouncilmanic elections in Jefferson Parish. In *Citizens for a Better Gretna v. City of Gretna,* 834 F.2d 496, 503 (5th Cir.1987), this Court approved the use of exogenous elections in cases with "sparse relevant statistical data." In this case, the district court found that the four councilmanic primaries in which blacks were candidates would not provide sufficient evidence to determine whether polarized voting exists in Jefferson Parish. 691 F.Supp. at 999–1000. That finding was not clearly erroneous.

### Racial Polarization in Elections Involving Black Candidates

■ The district court limited its investigation of racial polarization to elections involving black candidates. In a plurality section of *Gingles,* Justice Brennan asserted that "only the race of the voter, not the race of the candidate, is relevant to vote dilution analysis." *Gingles,* 478 U.S. at 68, 106 S.Ct. at 2775. This Circuit has subsequently held that "the race of the candidate is in general of less significance than the race of the voter—but only within the context of an election that offers voters the choice of supporting a viable minority candidate." *Citizens for a Better Gretna,* 834 F.2d at 503. The district court did not err by limiting its investigation of racial polarization to elections involving black candidates.

### Racial Polarization in Councilmanic Elections

■ The Supreme Court in *Gingles* refused to enunciate a "simple doctrinal test for the existence of legally significant racial bloc voting" because "the degree of racial bloc voting that is cognizable as an element of a § 2 vote dilution claim will vary according to a variety of factual circumstances." 478 U.S. at 57–58, 106 S.Ct. at 2769–2770. The Court stated, however, that plaintiffs could prove racial polarization by "showing that a significant number of minority group members usually vote for the same candidates." 478 U.S. at 56, 106 S.Ct. at 2769.

In this case, black candidates ran in four primary elections, but none of the four black councilmanic candidates received a majority of black votes and none advanced to the general election. The district court found that two primary elections in 1983 were not racially polarized. But the district court also found that the 1975 and 1979 primaries were racially polarized even though none of the black candidates received a majority of black votes and even though the black candidate in the 1979 primary "was not the clear first preference among black voters." 691 F.Supp. at 1003. The minority candidate need not be the preferred candidate among minority voters. *Citizens for a Better Gretna,* 834 F.2d at 502. *Gingles* requires only that a "significant number" of minority voters usually vote for the same candidate. In both the 1975 and 1979 primaries, the black candidate would have advanced to the general election "had the [primary] election been held among only black voters." *East Jefferson Coalition,* 691 F.Supp. at 1003. The district court did not err in finding racial polarization in the 1975 and 1979 councilmanic primaries.

### V.

■ Evidence of racially polarized voting is relevant also to the third precondition under *Gingles*—whether a bloc-voting white majority usually defeats the minority's preferred candidate. The district court found that "when black candidates sought office in Jefferson Parish, a white bloc vote has consistently defeated what may be described as a more or less politically cohesive minority." 691 F.Supp. at 1004. This finding is not clearly erroneous.

### VI.

■ After proving all three preconditions of § 2 liability, plaintiffs in vote dilution cases must also show under the "totality of the circumstances" that the challenged electoral system impedes the ability of minority voters to elect representatives

of their choice. In evaluating the totality of the circumstances, the district court considered other factors listed in the Senate Judiciary Committee majority report accompanying the 1982 bill that amended § 2 of the Voting Rights Act. The court considered electoral practices that enhance vote dilution (for example, large electoral districts, 691 F.Supp. at 1008, and a minimum vote requirement, 691 F.Supp. at 994 n. 3), lack of minority electoral success (691 F.Supp. at 995, 1002), and a tenuous basis for the challenged electoral system (691 F.Supp. at 1007, 703 F.Supp. at 30). The court need not rule on all of the Senate factors as long it is satisfied that the totality of the circumstances warrant liability.

For all of the foregoing reasons, we AFFIRM the judgment of the district court. The case is REMANDED to permit the district court to supervise prompt implementation of the redistricting plan.

AFFIRMED.