Dennis THERIOT, et al.

v.

The PARISH OF JEFFERSON.

Civil Action No. 95–2453.

United States District Court,
E.D. Louisiana.

April 24, 1997.

Order Denying Motion to Alter or
Amend June 20, 1997.

Haywood Hansell Hillyer, III, Haywood H. Hillyer, III, Dominic Nicholas Varrecchio, New Orleans, LA, for plaintiffs.

Provino C. Mosca, Michael J. Laughlin, Salvador Anzelmo, Alan Mark Flake, Salvador Anzelmo Law Office, Gilbert R. Buras, Jr., New Orleans, LA, for intervenor.

Robert Namer, River Ridge, LA, pro se.

Harry A. Rosenberg, Maria Nan Alessandra, Phelps, Dunbar, LLP, New Orleans, LA, Monica J. Clay, Thomas Gerard Wilkinson, Jefferson Parish Attorney's Office, Harahan, LA, Roy J. Rodney, Jr., Kim Maria Boyle, Endya E. Delpit, Rodney, Bordenave, Boykin, Bennette & Boyle, New Orleans, LA, Anthony Messina, Harahan, LA, for defendants.

Elizabeth Johnson, Donna M. Murphy, Deanne E.B. Ross, Stephen B. Pershing, U.S. Dept. of Justice, Washington, DC, for U.S.

### ORDER AND REASONS

DUVAL, District Judge.

Plaintiffs Dennis Theriot, Ann Rodriquez, Ronald Perrin, Norman A. Ronquille, David J. Dowell, Iris C. Isenmann, Herman J. Carbo and the Maplewood Civic Association, Inc. brought the instant suit against the Parish of Jefferson, et al.[1] (referred to in globo as "Defendants" or "Jefferson Parish"). Plaintiffs seek to have the Court declare the present configuration of the Third Councilmanic District of the Parish of Jefferson ("District 3") unconstitutional contending that it constitutes an illegal racial gerrymander in viola-

tion of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983. Plaintiffs rely primarily on *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 ("*Shaw I*") and *Miller v. Johnson,* 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) for this proposition. Trial was held before the Court without a jury and the matter taken under submission. Having thoroughly reviewed the record, evidence, deposition testimony, memoranda and the relevant law, the Court has determined that defendants are entitled to judgment for the reasons that follow.

To the extent that any findings of fact are conclusions of law, they are adopted as such; to the extent that any conclusions of law are findings of fact, they are so adopted.

### FINDINGS OF FACT

**The Parties and Jurisdiction**

The plaintiffs noted above are seven registered voters who reside in District 3. The remaining plaintiff, Maplewood Civic Association, Inc. is a Louisiana not-for-profit corporation domiciled in Jefferson Parish, whose members are some of the registered voters residing in the Maplewood Subdivision, and a majority of whose members reside and are registered voters in District 3.

Plaintiff–Intervenor, Provino Mosca, is a person of the full age of majority and a resident of Harahan, Louisiana.

The Parish of Jefferson is a political subdivision of the State of Louisiana. The defendants at the time of trial were Tim Coulon, in his official capacity as President of the Parish of Jefferson; Aaron Broussard, in his official capacity as Chairman of the Jefferson Parish Council; and T.J. "Butch" Ward, Lloyd F. Giardina, Donald R. Jones, Edmund J. Muniz, John Lavarine, and Nicholas Giambelluca, Sr. as current members of the Jefferson Parish Council, who have been sued by plaintiffs in their official capacities.

[1] Plaintiffs also named Michael J. Yenni, then President of Jefferson Parish, Robert Evans, Jr., T.J. "Butch" Ward, James Lawson, Jr., Donald Jones, Edward Muniz, Anne Marie Vanderweghe, and Nick Giambelluca. These persons were all members of the Parish Council for the Parish of Jefferson (also collectively referred to as "defendants.")

Prior to trial, pursuant to Fed.R.Civ.P. 25(d)(1), parties described herein were substituted as the result of the death of Michael J. Yenni and the results of the intervening elections.

These defendants were and have been acting under the color of the statutes, ordinances, regulations, customs and usages of the State of Louisiana, Parish of Jefferson.

The Civil Rights Division of the Department of Justice intervened ("DOJ") and is aligned with defendants.

The Council of the City of Kenner ("Kenner")[2] also intervened in this matter to assert their interest in the continued three-way split of Kenner and Kenner residents' access to and influence over three council members elected from single member districts and one council member elected at large to the Jefferson Parish Council. Kenner is aligned with the defendants at this phase of the proceeding.

Although this matter was brought as a class action, no timely motion for certification was filed. Therefore, this action is not a class action.

The Court exercises its original jurisdiction over this action pursuant to 42 U.S.C. § 1983; 28 U.S.C. §§ 2201 and 2202.

**Background**

This case is preceded by a long and tortured history. As a result, an overview of its history is necessary to place the facts of this case in context. These facts are basically uncontested and as such the Court finds them to be true.

The Parish of Jefferson is a political subdivision of the State of Louisiana and as such is subject to the strictures of the Voting Rights Act. The Jefferson Parish Council is a governmental body organized under the laws of the State of Louisiana. Pursuant to the Jefferson Parish Home Rule Charter, the Parish of Jefferson is governed by a Parish President and a council that is comprised of seven members. The Jefferson Parish Council is authorized to manage and operate parish government for the Parish of Jefferson, Louisiana.

Jefferson Parish is oddly-shaped and contains widely-diverse population. (See attached map of which the Court has taken

judicial notice). The Parish stretches in a north-south direction with its largest population centers around the Mississippi River and Lake Pontchartrain. This area is reclaimed marsh land that was developed after World War II and much of the population growth began in the 1960's. South of this urban population surrounded by swamp are the areas of Lafitte and Barataria which are more rural in character. Further south crossing marsh, swamp, and water bodies, is Grand Isle which is 20 miles south of Barataria and is one of the foremost barrier islands for the State of Louisiana. This area is also rural in nature with fishing being its main source of income. Thus, the communities of interest vary within the Parish. Furthermore, those same geographic characteristics (uninhabitable marsh land) necessitate large, unpopulated land bridges to connect these diverse populated regions.

Beginning with its revised Home Rule Charter in 1957, Jefferson Parish changed from a police jury to a parish council form of government. The council members were elected through a combination of single-member, floterial, and at-large districts. Each of four the districts elected one councilman. One member was elected form a floterial district comprised of Districts 1 and 2. Another floterial member was elected at-large from Districts 3 and 4. The seventh councilman, the Chairman, was elected from the Parish at-large. This arrangement was commonly known as the "4–2–1 Plan."

In 1971, suit was brought, and the United States District Court for the Eastern District of Louisiana found that the districting plan for the Parish Council was malapportioned, and replaced it with a plan that satisfied the constitutionally required one-person, one-vote standard. *Grisbaum v. McKeithen,* 336 F.Supp. 267 (E.D.La.1971). In the court-ordered plan, two of the four single-member districts crossed the Mississippi River in order to remedy the malapportionment of the existing districts. The districting plan ordered in Grisbaum resulted in Districts 1 and 2 being unusually shaped, with District 2

---

**2.** The Council of the City of Kenner is the duly authorized legislative body of the City of Kenner pursuant to its Charter. Terry McCarthy, Betty Bonura, Marc Johnson, Jeannie Black, John Lavarine, III, Michele Branigan and Phil Capitano are the elected members thereof.

being very large in size, going from Grand Isle on the Gulf of Mexico to within a couple of miles of Lake Pontchartrain.

In January of 1986, a number of Jefferson Parish registered voters filed suit in a case entitled, *Cedric Floyd v. Parish of Jefferson,* C.A. 86–0265, alleging that the structure of the Jefferson Parish councilmanic districts violated the constitutional requirement of one-person, one-vote. In 1987, as a consequence of that suit, the United States District Court for the Eastern District of Louisiana found that the districts were again in need of reapportionment. In a consent decree entered to settle the suit, the Parish Council amended its Home Rule Charter and reapportioned the councilmanic districts in accordance with that decree. That decree required that Jefferson Parish reapportion the four single member districts to bring it into compliance with one-person, one-vote principles.

In the 1987 apportionment plan, Council District 1 included the easternmost portion of the Parish bounded by Orleans Parish to the east, Plaquemines Parish in the south, and Barataria Boulevard in the west (including Gretna, Harvey, and Marrero), and this area was connected by a narrow, largely uninhabited strip of land along the Mississippi River to an eighteen-sided corner of the East Bank (including the neighborhood of Southport and a portion of Metairie).

Council District 2 included the remainder of the West Bank bounded in the south by the Gulf of Mexico and Barataria Bay, in the west by St. Charles Parish, in the southwest by Lake Cataouatchi, and in the north by the Mississippi River, except where the district spanned the Mississippi River to include a nineteen-sided piece cut into the middle of the West Bank, extending as far to the north as I–10 bounded on the west by the Soniat Canal.

Council Districts 3 and 4 divided up the remainder of the East Bank. District 3 included Kenner and Harahan, the community of Riverbend, and the New Orleans Airport. District 4, the most compact of the districts, included the remainder of Metairie, as well as Bonnabel Place, Pontchartrain Shores and Pontchartrain Gardens.

The black portion of the population did not exceed 24 percent in any one of the districts under this plan.

This fact was not acceptable to a number of voters. The East Jefferson Coalition for Leadership and Development ("the Coalition"), the Lincoln Manor Civic Association, and a number of registered voters in Jefferson filed suit against the Parish of Jefferson alleging that that plan for apportioning seats on the Jefferson Parish Council violated § 2 [3] of the Voting Rights Act as the then existing system improperly diluted black voting strength. *East Jefferson Coalition for Leadership and Development, et al. v. Parish of Jefferson,* 691 F.Supp. 991 (E.D.La.1988). As a result of that litigation, a number of findings, which have been judicially recognized as they apply to this case, were made.

The district court in that case found, *inter alia,* that (1) the minority group was sufficiently large and geographically compact to constitute a majority within a single-member district; (2) a historic pattern of racial discrimination existed and that vestiges of that discrimination remained; (3) blacks in Jefferson Parish were politically cohesive; (4) racial polarized voting existed in 1975 and 1979 councilmanic primary races; (5) when black candidates sought office in Jefferson Parish, a white bloc vote consistently defeated candidates favored by black voters and that candidates favored by blacks could win council seats in Jefferson Parish only when the preferred candidates were white. Thus, under the totality of circumstances employing the test found in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the district court found the electoral system in Jefferson Parish impeded the ability of minority voters to elect representatives of their choice. The court held that Jefferson Parish

---

**3.** Section 2 of the Voting Rights Act forbids state voting procedures which abridge voting rights "on account of race or color" and states that redistricting plans which provide "less opportunity [to minorities] than other members of the electorate to participate in the political process and to elect representative of their choice" abridge voting rights. 42 U.S.C. § 1973 (Supp. 1994). *DeWitt v. Wilson,* 856 F.Supp. 1409, 1410 (E.D.Cal.1994).

was in violation of § 2 of the Voting Rights Act and ordered alternative plans from plaintiffs and defendants in that case to be submitted.[4]

**The First Foray to Form District 3**

Initially, Jefferson Parish proposed a "6–2–1 Plan," which would have increased the size of the council from seven to nine members—6 from single-member districts, two members from single-member "superdistricts," and one member at large. This plan created no black majority district; District 3, under this proposal had a 45.9% black population. In a Proposed Order dated January 19, 1989, the district court tentatively approved Jefferson Parish's Plan with one modification—the elimination of the two superdistricts. *East Jefferson Coalition v. Parish of Jefferson*, 703 F.Supp. 28 (E.D.La.1989).[5] The court in that ruling recognized that the legislative body charged with the basic charter-invoked responsibility must be given the first opportunity to devise an acceptable remedial plan. *Id.* at 29. However, it rejected the superdistricts because the creation of three at-large seats "would be essentially (and impermissibly) guaranteed to be 'white seats' due to the relatively low overall percentage of blacks [parish wide]." *Id.* at 30. The court rejected Jefferson Parish's justification that superdistricts were necessary to represent the East and West Banks.

A fairness hearing was then held on March 2, 1989, the results of which were memorialized by the court in Order and Reasons found at 706 F.Supp. 470 (E.D.La.1989). Apparently, Jefferson Parish accepted the *East Jefferson Coalition* court's elimination of the superdistricts and as such, the court approved the modified plan. In its order, the court noted that the plan likely would again be modified to reflect the 1990 Census before being implemented for the next set of parish elections to be held in 1991. *Id.* at 472.

On March 7, 1989, the Jefferson Parish Council formally adopted this 6–1 plan. On July 7, 1989, the Court ordered Jefferson Parish to submit to the Attorney General the 6–1 redistricting plan and change in method of election for review pursuant to § 5 of the Voting Rights Act, 42 U.S.C. § 1973c ("Section 5").[6] On September 1, 1989, the Parish submitted the plan to the Attorney General. This 6–1 plan still did not contain a black majority district; one district had a black population of 46%. This September 1, 1989 plan was adopted by a vote of a majority of the Parish Council.

**The First Majority–Minority, 6–1 Plan**

On November 17, 1989, the Attorney General interposed an objection to the September 1, 1989 districting plan, pursuant to Section 5. The Coalition then sought to impose their seven single-member district plan, and the United States participated as *amicus curie* at the hearing of the plaintiffs' motion for implementation of their plan. Shortly before the hearing, the parties to the *East Jefferson Coalition* case agreed upon a revised "6–1" districting plan that created one African–American majority district, District 3. It had a total black population of 51.7%, using the 1980 Census figures. The 1980 Census indicated that Jefferson Parish had a total population of 454,592 persons, of whom 380,645 (83.7%) were white and 63,001 (13.9%) were black.

On February 16, 1990, Jefferson Parish submitted a second six single member district plan to the Department of Justice for preclearance under Section 5, which included a district with a black-majority voting age population ("BVAP") of 51.7%. This plan was submitted to the Parish Council.

However, that plan was revised and superseded by a March 23, 1990 submission (the March 1990 plan)(plaintiffs' Exhibit 33) to the DOJ for Jefferson Parish. It was adopted by a majority of the Council, including James Lawson. On May 10, 1990, the Attorney General precleared this plan. Af-

---

**4.** These facts were presented to the Court as uncontested in the parties' pre-trial order and are adopted by the Court as such.

**5.** The Court has taken judicial notice of all of the preceding litigation and findings.

**6.** Section 5 of the Act prohibits a region subject to its provisions from implementing changes in any "standard, practice, or procedure with respect to voting" without authorization from the United States Attorney General. 42 U.S.C. § 1973c. *DeWitt v. Wilson,* 856 F.Supp. at 1410.

ter the preclearance from the DOJ, the court approved the redistricting plan developed by the Jefferson Parish Council as the proper remedy to respond to the violations of the § 2 of the Voting Rights Act. On June 6, 1990, the district court entered a final order accepting the precleared plan.

The matter was appealed to the United States Court of Appeals for the Fifth Circuit. On March 21, 1991, the Fifth Circuit affirmed the district court's finding that the then-existing councilmanic structure was in violation of § 2 of the Voting Rights Act. *East Jefferson Coalition v. Parish of Jefferson,* 926 F.2d 487 (5th Cir.1991). The Fifth Circuit also remanded the case to the district court to "permit the district court to supervise prompt implementation of the redistricting plan." *Id.* at 494.

After remand from the Fifth Circuit's March 21, 1991 ruling, the district court held a status conference stating that the plan had to be modified to accord with the population variances triggered by the 1990 Decennial Census. The court again encouraged the parties to work together to formulate the necessary modifications in an expedited fashion and to adhere to a May 15, 1991, deadline for submission of a modified redistricting plan.

### Post–1990 Census—the Lawson Plan

In early 1991, the 1990 Census Data for Jefferson Parish had been released and showed that there was a substantial population deviation among the districts in this newly created districting plan. Jefferson Parish had a total population of 448,306 persons, of whom 74.0% were white and 17.5% were African–American. District 3 as configured under the March 1990 adopted plan was shown to have a BVAP of 52.3 %.

Pursuant to the district court's directives, the Jefferson Parish Council modified the redistricting plan to accord with various changes necessitated by the latest census, and adopted the new plan by resolution on May 8, 1991. The modified redistricting plan retained the 6–1 councilmanic scheme, with six single-member councilmanic districts and one at-large seat. The plan also included an African–American majority councilmanic district, District 3, with a BVAP of 57.4%, an increase of 5.1% in BVAP from the March 1990 configuration.

On May 15, 1991, the Parish of Jefferson filed its modified plan with the district court in conjunction with a memorandum of law in support of the Council's proposal and a joint stipulation of the parties. The district court, however, appointed a special master. The plaintiffs in the *East Jefferson Coalition* case then requested that the district court order the parish to bide by the terms of the joint stipulation and submit the May 8, 1991 plan to the DOJ for preclearance. The trial court denied the plaintiffs' request for an injunction requiring submission of the plan for Section 5 review, and the plaintiffs filed an appeal with the Fifth Circuit. On June 10, 1991, the special master submitted a "6–1" redistricting plan to the district with a 49 % black voting age population, which was a reduction of the total black percentage in District 3 from the stipulated plan. On July 24, 1991, the trial court entered a Judgment implementing the redistricting plan drawn by the special master.

On appeal, on August 8, 1991, the Fifth Circuit approved the stipulated redistricting plan adopted by the Jefferson Parish Council on May 8, 1991, reversed the trial court's July 24th Judgment, and remanded the case to the district court. Specifically, the Fifth Circuit found the special master's plan to be a "Judge Made Plan" and that the district court had unlawfully intruded "into the bailiwick of the legislative branch of local governments." In its ruling, the appellate court rejected the special master's plan for its failure, *inter alia,* to include one district with a majority black voting age population.

In its remand order the Fifth Circuit order specifically instructed the district court "to issue an injunction as soon as practicable, commanding [Jefferson Parish] to submit the May 8th Plan to the USAG for expedited review under § 5 of the VRA; and thereafter to ORDER implementation of the May 8th plan immediately upon receipt of notice of preclearance of the May 8th Plan, assuming preclearance is timely forthcoming." *East Jefferson v. Parish of Jefferson,* C.A. No. 91–

3511 and No. 91–3655, slip op. at 6, 940 F.2d 1531 (5th Cir. August 8, 1991) (unpublished).

Accordingly, the district court issued a Judgment dated August 13, 1991, revoking its previous Judgment of July 24, 1991, and ordering that the Jefferson Parish Council immediately submit the May 8th plan for preclearance in accordance with Section 5. Jefferson Parish complied with that order and on August 27, 1991, the DOJ precleared the stipulated plan of May 8, 1991. It is that plan which is the subject of this suit.

## The Final Plan Based on the 1990 Census Results.

■ The foregoing, uncontested facts indicate in only a minor way the contention, acrimony and difficulties encountered in arriving at a "compromise" plan based on the new 1990 census figures. The Court must now make its findings with respect to what was the primary force in the creation of District 3. Plaintiffs contend that race was predominant; however, the Court finds that while it was a factor, it is clear that political incumbency drove the pencil in designing these districts. Other factors that were at work were (1) the need to maintain a one-person/one-vote ratio in the overall makeup of these districts, (2) the geographic realities of this parish, including considerations with respect to contiguity and compactness, and (3) other traditional districting principles. All were significant factors in the configuration of District 3 and far surpassed any racial concerns in the design of District 3. Indeed, the Court finds that the shape of District 3 was far greater a function of the "shape" of District 2 where James Lawson ("Lawson"), the "incumbent" from the 4–2–1 District 2, intended to run and win against his opponent Lloyd Giardina. Furthermore, District 3 has proven to unite valid communities of interest. The plan which is the subject of this lawsuit was the brainchild of James Lawson. Hence, the Court will referred to it as the "Lawson Plan."

**Incumbency**

While the first majority-minority plan based on the 1980 census figures was adopted by Jefferson Parish, it had no real political consequences since the next scheduled elections were to occur after the 1990 Census results were to be implemented. The politicians knew that the changes in population would result in a modification of the 6–1 Plan. Furthermore, the next elections would necessarily pit incumbents against one another with the removal of the "floterial" seats. Indeed, Lawson testified that he was not as concerned with the configurations of those districts in the initial March 1990 scheme for that precise reason.

Thus, when the 1990 census figures were produced, Lawson knew that his political future hinged on obtaining the "best possible" District 2 from an electoral standpoint. Lawson had represented District 2 under the 4–2–1 Plan. District 3 was to remain the majority-minority district, so Lawson set out to insure that his strongest political constituencies would be placed in District 2 and that his anticipated opponent Lloyd Giardina's strongholds would be placed in District 3.

As a result he purposefully intended to have Westwego, the Lafitte area, Harvey, Marrero and Avondale in his bailiwick. With these goals in mind, certain areas of what had been a more "compact" district, were cut and spliced onto District 3. If an area was considered good political fodder for Lawson or if it was considered harmful to Giardina, that area was placed in District 2.

Thus, precincts were carved up and politically gerrymandered. Grand Isle and lower Lafitte had been in District 2. These areas were "pro-Giardina"; thus, Lawson recognized that it would be more favorable to move these areas out of District 2 into District 3. This area is in the southern portion of the Parish and is divided from the incorporated municipality of Jean Lafitte by canals and the Intracoastal Waterway. Thus, Lawson carved a "v" into that tail, the entirety of which previously had been in District 2 and protected as much of the Lafitte area [7] which

---

7. 1L and 2L—precincts of the Village of Jean Lafitte, 248 and 246B all went into District 2 for this reason.

he considered politically positive territory. This area remained in District 2. He jettisoned the rest into District 3; thus, Grand Isle and Barataria became part of District 3.

Race could not have motivated this division. Under the precinct-by-precinct population data for the challenged plan in Plaintiffs' Exhibit 5, the total 1990 Census black population of Precinct 247, the unincorporated area across the waterway form the town of Jean Lafitte, which Defendants' Exhibit 19 shows was allocated to District 3 rather than District 2, contains 170 persons, of whom only 14.7 % are black. Accordingly, the assignment of undivided precinct 247 to District 3 did not increase the level of black voting strength in resulting District 3.

With respect to Avondale, it would have been easier to have left this area in District 3 as the area was more African–American in population; however, Lawson insisted on moving part into District 2. As a result Precincts 157A and 157B were created. Precinct 157A was populated and went into District 2; Precinct 157B is basically unpopulated, and it went into District 3 to provide a land bridge to Grand Isle. (Testimony of Gandolfi).

Marrero, a perceived Lawson stronghold, was carved up, in particular Precinct 174A & 174B. Precinct 174B is by far the larger portion and it went into District 2. Precinct 174A became part of District 3.

Woodmere likewise was divided. Lawson for political reasons also sought to eschew that part of the Woodmere Subdivision whose residents he had angered by diverting funds earmarked for drainage relief in the form of a pumping station, but which funds were insufficient for that purpose, to another project. (Testimony of Lawson, Kenneth Hughes, Alan Gandolfi, and Ward). Furthermore, the division of Woodmere, with Precinct 195 in District 2 and Precinct 196 in District 3, cannot be explained by claiming race was the motivation. Neither precinct is majority black—Precinct 195 is 22.4% black and Precinct 196 is 27.7% black.

**Other Plans Considered**

At least two other plans were considered, both of which may have been more "compact" or "prettier." The East Jefferson Coalition proposed their plan which had a majority-minority district with a BVAP of 55%. This plan ran in a more east-west direction which parallels the direction of the African–American population of Jefferson Parish. Nonetheless, this plan totally eschewed all principles of incumbency and traditional geographic districts in Jefferson Parish making its viability dubious at best. Obviously, this plan had no support by the Parish Council and thus, as plans are to generally be the product of the legislature, its future was bleak. However, one outgrowth of this plan was the belief on the part of Lawson that his plan had to "meet or beat" the BVAP of the majority-minority district of the East Jefferson Coalition Plan. However, the testimony is unequivocal that this perception was only in Lawson's mind. DOJ never required this heightened BVAP. Thus, to the extent that the "meet or beat" goal existed, it was political in nature—Lawson wanted insurance that his plan would be adopted as it protected his position. This was not an instance of race as proxy.

The other plan was one propounded by Lloyd Giardina, the floterial incumbent, who had chosen to run in District 2 because Butch Ward was his ally and Ward was the incumbent in District 1. This plan likewise was "prettier" and the traditional non-"V'd" District 2 remained in tact. Woodmere remained in District 2 and Avondale was in District 3. He had wanted to include Terrytown and Maplewood in his version of District 2; however, one-person/one-vote concerns prevented him from doing so. His plan was politically dead in the water. Lawson had out-maneuvered Giardina. Giardina could not even get a second for his plan. Lawson had previously obtained the votes of the other council members based on their belief that the Lawson plan preserved a politically ideal situation—their re-election. Furthermore, as to Lawson's opinion of the Giardina Plan, he admitted that it was unacceptable because it took away Lawson's voting strength and added voters to District 2 that were not familiar with him.

## One–Person/One–Vote Considerations

The testimony was overwhelming that one-person/one-vote considerations were paramount in configuring these districts. (Testimony of Gandolfi, Lawson, Duker, Gelfand and Creed). Considering that Jefferson Parish had been taken to task in prior suits for its failure to abide by this principle, the council members were intimately aware of the need to spread population evenly. Alan Gandolfi, who is an attorney and was a research analyst for Jefferson Parish at the relevant time, testified that indeed this factor was his primary concern in doing his job with respect to the creation of a districting plan. For Gandolfi, with respect to tailoring the plan, one-person/one-vote considerations were followed by the need to remedy the § 2 violation and finally political wishes. With the 1990 Census results, District 3 had lost and District 1 and 2 had gained population. As District 2 was contiguous to District 3, geographically and for the sake of compactness, population needed to be moved into District 3.

Furthermore, the division of the Maplewood Subdivision was the result in part of these concerns. Maplewood had been initially placed wholly in District 3; however, Ida Saik had raised political Cain because she did not want to be taken out of Butch Ward's district, District 1. While community of interest concerns would militate against dividing a subdivision, it was imperative that for purposes of one-person/one-vote, the entirety of the subdivision not be put in District 1; hence, the split with Precincts 213A & C staying in District 3 and Precinct 213B being placed in District 1.

Also, the "zig-zagging" around the Harvey Canal was also necessitated by the one-person/one vote dictate. It was because of this concern that District 3 crossed over the Harvey Canal. (Testimony of Duker).

## Geographic Considerations, Including Compactness and Contiguity

Historically, Jefferson Parish districts ran in a north-south direction. Considering that the parish is tongue-shaped, this fact is not surprising. However, the African–American population runs more in an east-west direction. Thus, in trying to form a majority-minority district these two realities had to be reconciled. Those persons involved in the actual drafting of the plan, Gandolfi, Hughes and Duker, all testified that compactness and contiguity were thus concerns.

Because of the need for contiguity particularly in light of the need to include certain more north-eastern population centers in District 3, precincts were divided to provide land bridges. One, which was previously discussed, was Avondale with respect to Precincts 157A and 157B. As noted, however, 157B is uninhabited, so splitting it off did not effect a community of interest. Harvey and Marrero were similarly split for bridging purposes and the Lafitte area as well.

Another factor that makes a more "perfect" configuration difficult is that there are vast tracts of uninhabited areas which make the districts more irregular in shape. (Testimony of Creed). Furthermore, dividing the district into 6 rather than 4 creates more margin for irregularity. Thus, taking into account all of these factors, the instant plan is sufficiently compact.

## Other Traditional Districting Considerations

Jefferson Parish was not unaccustomed to splitting districts in order to achieve political goals. Indeed, as previously noted, most "splits" are supportable with viable reasons. Furthermore, as the precincts which were being split were somewhat new resulting from the mandate of the state legislature, the communities of interest were not as rigid within the precinct. (Testimony of Duker, Plaintiff's Exh. 15, Exh. G, D0117). Thus, it was not unusual, or contrary to Jefferson Parish's traditional districting considerations to split precincts even though this might not be the general norm.

■ David Creed also testified and the Court finds that no actual "stacking" occurred. "Stacking" is where more than 90% of one race is included or less than 10% of one race is left out of a district. Stacking is generally considered acceptable in the districting context. Had Jefferson Parish intended to stack, it could have included Shrewsbury and McDonoughville which it did

not. Thus, the evidence does not prove that race predominated.

### Communities of Interest

Plaintiffs maintain that there is little evidence that communities of interest were actually considered as such in the shaping of the subject district. However, this position ignores the fact that the Jefferson Parish Council which drafted the subject plan were defendants in the *East Jefferson Coalition* case during which evidence concerning the socio-economic conditions of the Parish's neighborhoods and subdivisions was produced. Obviously then, the Parish council was not oblivious to these facts.

Furthermore, it is evident to this Court that District 3 for the most part does share communities of interest. To begin, the historical background provided by Wilma Irvin Laurence Powell, and Eugene Fitchue prove that the African–American communities located both on the East Bank and the West Bank of Jefferson Parish has been united in their efforts to improve schools, fire protection, sewerage, drainage and to obtain paved streets and sidewalks for their neighborhoods. The creation of the majority minority District 3 has created a legitimate opportunity to respond to neighborhood concerns and be more successful in achieving these goals.

Arleta Terrel's testimony further confirmed that a community of interest exists because of the economic similarity of the African–American community in District 3. The black residents of Jefferson Parish are a socioeconomically distinct community in that, as a group, they are dramatically lower in income, less educated, and more poorly housed than their white counterparts. District 3 does bring together a community of interest among black residents of the Parish that manifestly belonged in a single district, and had long been fragmented among council districts to the detriment of present District 3's residents.

One could argue that the splitting of the Maplewood subdivision would indicate that communities of interest were ignored. However, the reality is that (1) Ida Saik caused the division and (2) the Court heard precious little testimony of any real harm arising out of this division.

Another community of interest that plaintiffs claim was disrupted was the split between the townspeople of Lafitte assigned to District 2 and the others in the unincorporated area beneath it in District 3. The Court heard ample credible testimony that the communities of interest were not trampled because these two areas did not actually contain one cohesive group as evidenced by the fact that the lower area chose not to become part of Village of Jean Lafitte.

Finally, the Court finds that by virtue of the geographic realities of the Parish and the history of its development, the Parish itself is made of extremely different communities of interest. This Parish has as residents some of the most wealthy individuals in this state as well as some of the most poor. It contains both urban and rural societies. It houses bustling industrial and retail centers as well as fishing communities. Considering these realities, District 3 as constituted has united, as closely as possible, interests that are related.

### Wildgen Testimony and the Use of the Geodistricting Software

The Court finds that the use of the Geodistricting Software did not predominate in the formulation of District 3. While it is beyond cavil that race was a consideration, it did not drive the Lawson Plan. John Wildgen testified otherwise; however, the Court found his testimony to be unavailing.

Wildgen designated 5 areas that he claims were "black" areas used solely to increase the "blackness" of District 3. With respect to the Kenner precincts 13K-b, 21K and 22K, the Court does not find this projection so irregular. Furthermore, the community of interest at work supports its inclusion in District 3. Furthermore, with respect to Precinct 13K-b, Wilma Irvin testified that this division is consistent with the split Kenner district lines. With respect to the Avondale Precincts 156 and 157B, 157B was divided for a land bridge and contains no people. Concerning the Marerro Precincts 173, 180 and 181, the Court believes the evidence demonstrated that these were moved because of one-person/one-vote concerns. Likewise,

certainly the Maplewood division was explained adequately for one-person/one vote concerns, along with the Ida Saik' uproar. Finally, with respect to Precincts 104 and 33K, these areas certainly share the community of interests such that they should be included in District 3.

Likewise, the Court found less than persuasive the testimony of Robert DeViney who was involved in the redistricting process. He testified that the configuration of District 3 was a racial gerrymander. He testified that he disagreed with the entire process arising out of the Voting Rights Act allegations making in this context his opinion suspect. Other like opinions (i.e. District 3 was a racial gerrymander), were demonstrated to be without foundation in fact through the evidence adduced at trial.

**Retrogression**

■ Because of the increase in black population in District 3 under the findings of the 1990 Census, Jefferson Parish was justified in using 52.3% BVAP as the benchmark for to determine retrogression under Section 5. The Court recognizes that Lawson overshot this number by almost 5% points. However, as explained in detail above, the motivation here truly was political not racial. Plaintiffs did not prove in their case that there was the kind of coercion and intent to "maximize" black population within District 3 by DOJ that was criticized in *Miller v. Johnson,* 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). Here, it was not DOJ, but Lawson's albeit misguided appreciation of the situation which resulted in this jump.

**Vestiges of Discrimination**

■ The record of the *East Jefferson Coalition* case, many of the uncontested facts contained in the Pre–Trial Order and the testimony received at trial lead to the ineluctable conclusion that there remains vestiges of discrimination in Jefferson Parish. The court finds based on the testimony of Irvin, Cassimere and Powell that there are vestiges of discrimination. In particular the evidence with respect to the resolution to isolate the predominantly white portion of Maplewood from the predominantly black by use of a barricade is compelling. Another incident

has to do with the stop orders issued by Sheriff Lee concerning stopping black individuals in predominantly white neighborhoods. While discrimination is certainly not on the scale of what it was in the 1950's, race neutrality has not been achieved in Jefferson Parish at this time.

**Plaintiffs' Contentions**

■ As noted, plaintiffs contend that District 3 is the product of an racial gerrymander and seek the redistricting of the Jefferson Parish Council on "a basis not predominantly motivated by racial considerations" relying on *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 ("*Shaw I* ") and *Miller v. Johnson,* 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). Plaintiffs argue that race was the predominant factor in the configuration of District 3 and as such must be subject to "strict scrutiny." They further maintain that strict scrutiny will demonstrate that the district was not "narrowly tailored" and thus is unconstitutional in its present configuration. As a basis for this position, plaintiffs rely on the odd shape of the district and the context in which District 3 had its genesis. Plaintiffs bear the burden of proof in these respects, and this Court finds that plaintiffs failed in this endeavor.

**CONCLUSIONS OF LAW**

**The Applicable Law**

■ In *Miller,* the Supreme Court grappled with the constitutionality of Georgia's Eleventh Congressional District which had been configured in response to the Justice Department's refusal to preclear earlier reapportionment plans pursuant to § 5 of the 1965 Voting Rights Act. As the Fifth Circuit noted in *Clark v. Calhoun County, Mississippi,* 88 F.3d 1393 (5th Cir.1996), discussing plaintiff's burden of proof as set forth in *Miller:*

> The Court encountered greater difficulty, however, in affirmatively defining the plaintiff's burden of proof. The Court acknowledged that legislatures will "almost always be aware of racial demographics; but it does not follow that race predomi-

nates in the redistricting process." [*Miller*, 515 U.S. at ——, 115 S.Ct. at 2488]. Distinguishing between permissible awareness and impermissible motivation "may be difficult" and will require courts "to exercise extraordinary caution in adjudicating claims that a state has drawn district lines on the basis of race." *Id.* Nevertheless, the Court attempted a definition:

> The plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district. To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, to racial considerations.

*Id.* Justice O'Connor added in her concurring opinion that this standard was "a demanding one," requiring the plaintiff to show that the legislature "has relied on race in substantial disregard of customary and traditional districting practices." *Id.* at ——, 115 S.Ct. at 2497 (O'Connor, J., concurring). In those cases where the plaintiff successfully proves that race was the "predominant, overriding" consideration motivating the drawing of district lines, the burden shifts to the defendant to demonstrate that its districting plan is narrowly tailored to achieve a compelling governmental interest. *Id.* at ——, 115 S.Ct. at 2490.

*Id.* at 1402–03. If a district is "narrowly tailored" it survives "strict scrutiny" and is not unconstitutional.

■ The Supreme Court explained in *Bush v. Vera*, —— U.S. ——, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996):

> Strict scrutiny would not be appropriate if race-neutral, traditional districting considerations predominated over racial ones. We have not subject political gerrymandering to strict scrutiny.... And we have

recognized incumbency protection, at least in the limited form of "avoiding contests between incumbent[s]," as a legitimate state goal....

*Id.* at ——, 116 S.Ct. at 1954 (citations omitted).

Thus, this Court must find that Jefferson Parish ignored, *inter alia*, compactness, contiguity, respect for political subdivisions or communities defined by actual shared interest, as well as the overriding necessity of creating districts true to the principles of one-person/one-vote, to racial considerations in order to decide whether an Equal Protection Claim has been raised. Then, if race predominates, the Court must assess whether Jefferson Parish can satisfy strict scrutiny.

If it so finds, Jefferson Parish would then be required to demonstrate that its districting legislation is (1) narrowly tailored (2) to achieve a compelling state interest. *Miller*, 515 U.S. at ——, 115 S.Ct. at 2490.

### Does District 3 Require Strict Scrutiny?

■ The Court finds that plaintiffs failed to carry their burden of proof with respect to proving that racial considerations predominated in the configuration of District 3 that is the subject of this litigation. While race, through the force of § 2 of the Voting Rights Act, provided the genesis for the majority minority district, it did not dictate the eventual boundaries of District 3. An analysis of the evidence adduced supports this finding.

### Shape of the District

While plaintiffs have consistently opined that the shape of this district is so bizarre on its face as to be inexplicable on grounds other than race, this Court disagrees completely. Even at first glance, this Court does not believe that the shape is so horrific so as to demonstrate circumstantially that race motivated the form of the district. District 3 is neither a "Rorschach ink-blot test" nor a "bug splattered on a windshield." It does not wind in a serpentine fashion; it dos not resemble "a sacred Mayan bird." This district does not have those visual indices that are so allegedly obvious in *Hayes, Miller* and *Shaw.* There are not the kind of narrow land

bridges that conflict with the Eleventh Amendment and were condemned in *Miller.* Most, if not all of those "bridges" are uninhabited, geographical necessities in District 3.

The Court recognizes that in the past, District 2 was comprised of the entire "peninsula" that is Jefferson Parish's wetlands tail. All of Lafitte and Barataria were included. Thus, to the extent that the length of the district creates "irregularity", that is necessitated by the Parish's shape. Nonetheless, the Lafitte split was proved to be anchored in political necessity and the Lawson/Giardina fight for a district. Furthermore, the geographic concerns outlined earlier also explain the peculiar shape. Grand Isle is 20 miles away from the nearest land mass in the north-south axis of this district. In relation to the breadth of the east-west axis, there are also immense unpopulated areas included that make this area vast. Moreover, these areas have a substantially predominate white population.

This Court stands convinced that the changes that occurred to create District 2 and District 3 as they are now configured were driven primarily by politics. The second force was the concern centered around one-person/one-vote. Race was a concern, but it did not predominate. For example, Lawson's decision to reach in and take Avondale into District 2 for political reasons, required substituting other populations for that which was stripped out of pre–1990 Census District 3. Politics also drove part of Woodmere into District 3. The Court will not reiterate its previous findings of fact. However, the Court firmly believes that those findings support the conclusion that strict scrutiny has no place in this inquiry.

This is not an instance where the councilmen used race as proxy. They were intimately aware of the various voting habits of their various constituents. They did make partisan political decisions in which race was used as a means to identify potential constituent support. All council members did testify as to their familiarity with the constituent neighborhoods in and surrounding District 3 and where applicable the degree to which these areas had supported their respective candidacies in the past. This fact is most evident in the testimony of both Lawson and Giardina.

### Nonretroactive Application of *Shaw I* and Its Progeny

As previously noted, the plan at issue herein was specifically approved by the Fifth Circuit, and the Parish was thereby ordered to submit that plan to the United States Attorney General for expedited review under Section 5. *East Jefferson v. Parish of Jefferson,* C.A. No. 91–3511 and No. 91–3655, slip op., 940 F.2d 1531 (5th Cir. August 8, 1991) (unpublished). The parties have not cited to the court any reapportionment case where any court, applying *Shaw I* and its progeny, has overturned a districting scheme adopted pursuant to a United States Appellate Court decision. Therefore, there is a question as to whether *Shaw I* and progeny should have a retroactive effect on the instant plan.

In *Jackson v. DeSoto Parish School Board,* 585 F.2d 726 (5th Cir., 1978), the late Alvin B. Rubin writing for the court, stated:

American citizens have a constitutional right to participate fully and effectively in the election of county governmental authorities, . . . reapportionment plans, whether adopted by legislative enactment or court order, are not immutable. The judicial process must be flexible enough to allow changes to schemes that have, because of changing population patterns and the developing body of constitutional jurisprudence, become unconstitutional in their operation.

[While decennial a reapportionment as a rational method], . . . this does not mean that a political body cannot be compelled to reapportion itself more than once every ten years.

A challenge to the constitutionality of a court—or a reapportionment plan—is not precluded by principles of res judicata or federal estoppel. It has long been established that res judicata is no defense where, between the first and second suits, there has been an intervening change in the law or modification of significant facts creating new legal conditions . . .

Such inequity becomes particularly intolerable when, as here, constitutional rights are involved. This court has thus been unwilling to bar subsequent challenges to reapportionment schemes, seemingly constitutional when institute by the court, but apparently adequate under the rapidly changing jurisprudence in this area....

*Id.* at 728–29.

Defendants acknowledge that their challenge to the constitutionality of a court ordered reapportionment plan is not precluded by principles of res judicata or collateral estoppel. However, the defendants do contend that this Court should exercise its discretion to decline remedial action in the application of recent constitutional jurisprudence because of the manifest injustice to the Jefferson Parish defendants. Defendants contend that this discretion is granted by the holding of *Chevron Oil Company v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). The Supreme Court outlined the relevant three factors to considered with regard to the nonretroactive application as follows:

First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed,.... Second, it has been stressed that 'we must weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' .... finally we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."

*Chevron,* 404 U.S. at 106–07, 92 S.Ct. at 355 (citations omitted).

In the event of retroactive application of the construction of the Equal Protection Clause and the Voting Rights Act in *Shaw I* and its progeny were applied here, defen-

dants urged that it would produce substantial and inequitable results. Jefferson Parish would allegedly be exposed to the penalty and burden of redistricting, in addition to the possible taxing of attorney's fees and costs of the plaintiffs against it as a "remedy" for its previous compliance with a remedy ordered by this very court in the *East Jefferson Coalition* case.

Since this Court has held that strict scrutiny does not apply in this case, and therefore, there has been no constitutional violation, no harm has resulted in re-evaluating the situation in light of *Shaw I* and its progeny. Thus, there being no "injustice" as defined by defendants resulting, there is no reason under the circumstances of this case not to apply the new case law. The Court recognizes that to a degree, this decision may be putting the cart before the horse and that in other circumstances a court may be faced with such a request early on in the litigation to forestall the application of a new principle of law. However, in the case at bar, this request was raised at the eleventh hour. As such, the equities dictated that the Court not exercise its discretion in this manner.

## CONCLUSION

█ In sum the shape of District 3 is certainly not a paradigm of compactness. However, it is not bizarre in comparison to districts which have been stricken by other courts. More importantly, most of its "aberrant" aspects were caused not by race but by the following: (1) political incumbency concerns, particularly those of James Lawson, (2) the unique configuration of the Parish, (3) the unique topography of the Parish as it is at least 50% marsh and water, (4) one-person/one-vote considerations, (5) vocal political activism such as that demonstrated by Mrs. Ida Saik, and (6) Grand Isle's being 20 miles away from any other inhabited area of the Parish. Thus, all of these factors, as well as those others mentioned above like community of interests, were considered by the Jefferson Parish Council while it was also conscious of race. As such, the Court is convinced that "in the context of redistricting, where race is considered only in applying traditional redistricting principles along

with the requirements of the Voting Rights Act, that strict scrutiny is not required." *DeWitt*, 856 F.Supp. at 1415. Furthermore, even if it were required, this plan has been narrowly tailored to meet a compelling state interest.

Accordingly,

**IT IS ORDERED** that judgment be entered in favor of the Parish of Jefferson, Tim Coulon, in his official capacity as President of the Parish of Jefferson; Aaron Broussard, in his official capacity as Chairman of the Jefferson Parish Council; and T.J. "Butch" Ward, Lloyd F. Giardina, Donald R. Jones, Edmund J. Muniz, John Lavarine, and Nicholas Giambelluca, Sr. as current members of the Jefferson Parish Council, who have been sued by plaintiffs in their official capacities; intervenor, the Civil Rights Division of the Department of Justice; Council of the City of Kenner ("Kenner") and against plaintiffs Dennis Theriot, Ann Rodriquez, Ronald Perrin, Norman A. Ronquille, David J. Dowell, Iris C. Isenmann, Herman J. Carbo and the Maplewood Civic Association, Inc., dismissing plaintiffs' complaint, with each party to bear his, her or its respective costs.

ATTACHMENT

### On Motions for New Trial and to Amend or Alter Judgment

Before the Court are plaintiffs' Motion for New Trial (Doc. 316 & 319) and defendants' Motion to Amend or Alter the Judgment (Doc. 318). The court heard oral argument on this day, and having reviewed the pleadings, memoranda, and the relevant law, finds no merit in either motion.

 Plaintiffs[1] have moved the Court pursuant to Fed. R. Civ. P. 59(a) to set aside the findings of fact and conclusions of law and the judgment entered herein on April 25, 1997, and grant a new trial, or, in the alternative, to amend its findings and conclusions to comport with plaintiffs' view of those facts proven at trial and plaintiffs' appreciation of the law.

As stated in *Burzynski v. Travers*, 111 F.R.D. 15 (E.D.N.Y.1986):

> Rule 59(a)(2) provides that a district court exercising sound discretion may grant a new trial in nonjury actions for the same grounds as in jury actions under Rule 59(a)(1). Any such motion must be based upon manifest error of law or mistake of fact and a "judgment should not be set aside except for substantial reasons." 11 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2821, at 136 (1973).

*Id.* at 16; *see* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 2804, at 53 (1995).

The Court finds no grounds upon which it should amend any of its findings or legal conclusions. The Court heard the evidence and testimony presented a trial and remains overwhelmingly convinced that the primary and most significant factor in the creation of District 3 was politics. The Court finds that plaintiffs' perception of the facts simply does not comport with the evidence actually adduced. The Court stands firm concerning its findings with respect to the credibility of the witnesses as contained in its original Order and Reasons. Politics was the pencil that drew District 3. Plaintiffs did not present evidence to convince the Court otherwise, particularly with respect to the individual precincts which plaintiffs contended created such a "tortured" district. Furthermore, the Court stands by its interpretation of the legal framework that provided the basis for the legal conclusions this Court reached.[2]

With respect to the Motion to Amend or Alter the Judgment Solely for the Purpose of Awarding Costs filed by defendants, the Court is unpersuaded by defendants' arguments. Rule 54(d) of the Federal Rules of Civil Procedure provides that "costs other than attorneys' fees shall be allowed as of course to thee prevailing party unless the court otherwise directs." As noted in 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 2668 (1983):

> Other than when the matter is controlled by a federal statute or rule, the court is vested with a sound discretion by Rule 54(d), which extends to all civil actions and embodies a practice long recognized in equity....
>
> In keeping with the discretionary character of the rule, the federal courts are free to pursue a case-by-case approach and to make their decisions on the basis of the circumstances and equities of each case, including such matters as the efforts and expenses of the parties.

*Id.* at 200–01.

 The most common bases for denying costs to prevailing defendants have been the indigency of the losing plaintiff. A wide

---

1. Plaintiffs are Dennis Theriot, Ann Rodriguez, Ronald Perrin, Norman A. Ronquille, David J. Dowell, Iris C. Isenmann, Herman J. Carbo and the Maplewood Civic Association, Inc.

2. The court would note that defendants have claimed that the Court erroneously enlarged the time for the filing of plaintiffs' motion; however, the Court believes this argument is without merit. An admittedly lacking motion for new trial was filed on May 6, 1997; however, a superseding motion that sort forth with sufficient specific-

ity the grounds for plaintiffs' motion was indeed filed on the last day possible. Because of the difficulties experienced obtaining a transcript, the Court extended the briefing schedule so that plaintiffs were allowed more time to file their memorandum in support. The Court believes this action comports with the constraints of Fed. R. Civ. P. 59. *See* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 2811–12 (1995).

disparity between the economic resources between the parties, such as there is in this instance, as well as the suit being neither frivolous nor brought in bad faith, convinces the Court that it should not assess costs in this instance. Plaintiffs did not have the resources to hire an expert in this case; they also were unable to depose certain parties because of their lack of resources. Based on the perception by the Court that to award costs here would be an undue hardship on these plaintiffs, the Court finds that it will not grant this motion. *See* Bartell, *Taxation of Costs and Awards of Expenses,* 101 F.R.D. 553, 561 (1984) and cases cited therein. Accordingly,

**IT IS ORDERED** that plaintiffs' Motion for New Trial (Doc. 316 & 319) and defendants' Motion to Amend or Alter the Judgment (Doc. 318) are **DENIED.**